JOSEPH D. SPAGNUOLO and JULIE SPAGNUOLO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Spagnuolo v. Commissioner
Docket Nos. 6754-82, 9234-82.
United States Tax Court
T.C. Memo 1985-528; 1985 Tax Ct. Memo LEXIS 104; 50 T.C.M. (CCH) 1281; T.C.M. (RIA) 85528; October 9, 1985. *104 Carolyn M. Conway and Francis J. DiMento, for the petitioners. Paul J. Dee, Jr. and Albert A. Balboni, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: These cases have been consolidated for purposes of trial, briefing and opinion. Respondent determined deficiencies and additions to tax as follows: Addition to Tax
Year
Deficiency
Sec. 6653(b)
1974
$14,813.36
$7,406.68
1975
$67,233.04
33,616.52
1976
62,343.10
31,171.55
The issues for decision are: (1) whether petitioner Joseph D. Spagnuolo received and failed to report taxable income in the amounts of $22,500.00, $112,220.00, and $105,700.00 for the taxable years 1974, 1975, and 1976, respectively, these amounts being the totals of checks received and negotiated by him with respect to which he was the final endorser; (2) whether any part of the alleged underpayment of taxes for the three years at issue were due to fraud with intent to evade tax under section 6653(b); [1] (3) whether the statute of limitations bars the assessment and collection of deficiencies in income taxes for any or all of the years at issue; (4) whether petitioners *105 are entitled to the benefits of income averaging for any or all of the taxable years at issue; and (5) whether petitioner Julie Spagnuolo is entitled to relief as an "innocent spouse" for any or all of the years at issue. FINDINGS OF FACT The stipulation of facts and attached exhibits are incorporated herein by reference. At the time the petition herein was filed, petitioner Joseph D. Spagnuolo resided at 55 Wiswall Road, Newton Centre, Massachusetts, and petitioner Julie Spagnuolo resided at 43 Fox Hill Road, Newton Centre, Massachusetts. Petitioner Joseph D. Spagnuolo (hereinafter petitioner) graduated from Brookline (Massachusetts) High School in the late 1950s and thereafter attended the Wentworth Institute of Technology for a short period. From 1961 to 1968 petitioner worked full time as a bartender at the Hideaway, a restaurant and bar owned by his father, which was located on Broad Street in downtown Boston, Massachusetts. After passing the stockbroker's examination on his second try in 1969, petitioner went to work as a stockbroker at Sterman *106 and Gowell. That company did not make it through the stock market crises which began in 1973, and petitioner went to work for another brokerage firm, Shearson, where he remained until about 1979. Petitioner ceased working at the Hideaway in 1968, when he started in the brokerage business, but returned in 1974 on a part-time basis filling in at noon time and during the late afternoon and dinner time when the restaurant was particularly busy, as a bartender, chef, or whatever else was needed. Since 1979, petitioner has acted as a full-time manager of the Hideaway, later known as Spag's Restaurant. During the years 1974 through 1976, petitioner worked part time for TBI Corporation (hereinafter TBI), overseeing the closing of a warehouse and the removal of the stock to new warehouses. TBI was owned by Robert Treisman, a next door neighbor and friend of petitioner. For several years prior to 1973, petitioner was very successful in the stock market, both through his own investments and through his brokerage commissions. He purchased an expensive house in a prestigious neighborhood, socialized frequently, and he and his family generally enjoyed a high standard of living. Petitioner *107 became a member of the Charles River Country Club, where he met two brothers, Felix and Anthony Orlandella (hereinafter Felix and Anthony), with whom he became very friendly. Felix was "like a brother," and he and petitioner spent a great deal of time together eating, drinking and gambling. Beginning in 1973 when the stock market went into a sharp decline, petitioner's financial fortunes also dropped dramatically. He no longer had substantial gains from his investments and his brokerage commission income fell off. He supplemented his brokerage income with the part-time job at TBI and by returning to work part time at the Hideaway. As petitioner's financial situation took a turn for the worse, so did his personal life. He began to drink excessively, continued his gambling, and marital problems developed. He became very depressed. Petitioner supported himself, his family and his gambling habits by depleting his family savings, selling his stock holdings, borrowing money, and cashing in life insurance policies in order to supplement his declining earnings. As a result of his friendship with the Orlandellas, petitioner became involved in some of their financial dealings. In *108 1972, petitioner signed as the real estate broker on various purchases of property by the Orlandellas. He had no interest in these properties, and turned over his commission check to the Orlandellas. With them he invested in Neponset Chemical Company, which was not successful. During the years at issue, petitioner received numerous checks from various parties, some of which were payable to him and some of which were payable to other parties. Petitioner endorsed these checks and either took them himself or caused them to be taken by one of the other employees at the Hideaway to one of the branch banks in the neighborhood with which he had established banking relationships during his successful days as a stockbroker. Petitioner, or his delegate, would cash the checks and distribute the proceeds. These transactions fell into several categories. With respect to Robert Treisman (hereinafter Treisman) the proceeds were used to pay off Treisman's gambling debts. During the years in issue, Treisman gambled on sporting events with various bookmakers. Because his two offices were located in Chelmsford, Massachusetts, and Manchester, New Hampshire, he found it inconvenient to travel *109 to Boston to pay off any losses to his bookmakers. He would ask petitioner, his next door neighbor and part-time employee, to take a check payable to petitioner to Boston, cash it, and pay over the proceeds to Triesman's bookmakers. Petitioner never received any of the proceeds of these checks, nor did he receive any compensation from Treisman for this service. For his friends, Felix and Anthony, petitioner provided assistance in a number of ways. He received checks from them payable to himself or to them, which he endorsed and cashed at one of the branch banks in the downtown Boston neighborhood. The cash was then either turned over to Felix or Anthony and used by them to pay their gambling losses, or kept for their personal purposes. Sometimes when Felix and Anthony had reached their limits with a particular bookmaker, petitioner would place the bets for them, but in his own name. Any losses were always paid by Felix and Anthony, usually by means of delivering a check to petitioner, as outlined above. Sometimes the checks usually in smaller amounts were for cash spending money for Felix or Anthony and were not related to gambling losses. Many of the checks which petitioner *110 received from Felix and Anthony were Treasurer's checks drawn on the Framingham Trust Company. It became known to petitioner later that these checks were part of a scheme by the Orlandellas and Michael Cortese, Treasurer of the Framingham Trust Company, to defraud the bank. Some of the funds obtained from Framingham Trust Company were the proceeds of loans which were collateralized by counterfeit American Telephone and Telegraph stock certificates produced by Anthony in which he used as a model a certificate for one share of AT&T stock in the name of one of petitioner's children. Petitioner loaned Anthony this stock certificate for the alleged purpose of Anthony's being able to show a stock certificate to his children. Anthony later was convicted and served time for his part in the defrauding of the Framingham Trust Company. Some of the checks from Framingham Trust Company were made payable to one George Leydon who was a "drunk" who hung out regularly at the Hideaway. Leydon's name was used when others at the Framingham Trust Company became suspicious of the number of checks being drawn to Felix and Anthony, and Cortese decided that it would be better to use some other name for *111 some of the checks. Leydon was oblivious to his part in the scheme, and these checks like the others were endorsed by petitioner, cashed, and the proceeds returned to Felix or Anthony or their bookmakers. In 1974 petitioner, at the request of Cortese, borrowed $30,000.00, the proceeds of which were turned over immediately to Felix. Petitioner was assured that the loan was fully collateralized, and understood that all payments would be made by Felix. Difficulties later arose with the arrangements between petitioner and Felix for the repayment of the loan, which ultimately led to the breaking up of their friendship. It developed that this was also part of the scheme to defraud the Framingham Trust Company which later sued petitioner for recovery of the $30,000.00. That matter was settled for $3,000.00. Many of the checks received and negotiated by petitioner came from the Massachusetts Industries Investment Corporation, which was a real estate development corporation owned by the Orlandellas. These were corporate checks received and negotiated by petitioner in the same manner as above to cover Felix' and Anthony's personal gambling losses. Petitioner did not receive any of *112 the proceeds of these checks, nor did he get any compensation from Felix and Anthony for his services. Felix and Anthony's mother and father paid over $1,000,000.00 to the Framingham Trust Company to reimburse the bank for losses resulting from the fraud scheme in which Felix and Anthony had participated. The final category of checks received and negotiated by petitioner were those he received from various construction workers, telephone company workers, mailmen, and other patrons of the Hideaway. In these cases he was merely cashing checks as an accommodation to these patrons of the restaurant and bar, and was not involved in their gambling or other activities. Petitioner received none of the proceeds of these checks, nor did he receive any compensation for this service. Petitioner was not a bookmaker at any time during the years 1974, 1975, and 1976, and, therefore, he received no income from that activity. OPINION Respondent has determined that petitioner had additional unreported income in each of the years 1974, 1975, and 1976. The amount of income for each year is the total for that year of checks received by petitioner, endorsed by him as the final endorser, and *113 then cashed by him. Respondent has concluded that petitioner was a bookmaker during these years, and that these checks all represented payments made to him by gamblers who had lost their bets. Respondent has included the full amount of these checks in petitioner's income, leaving petitioner to his proof with respect to the amounts which he had to pay to winners and the amounts of his expenses. Respondent then argues that petitioner's failure to report this income was due to fraud with intent to evade tax, which would result in additions under section 6653(b) and would also negate the statute of limitations defense. Respondent also denies petitioner's entitlement to the benefits of income averaging, and would reduce petitioner's medical expense deduction as a result of the computations based upon the increased income. Respondent has conceded the "innocent spouse" issue with respect to petitioner Julie Spagnuolo to the extent that the Court finds there was a 25 percent omission of income. Petitioner contends that at no time was he a bookmaker, and that all of the checks were received and negotiated as an accommodation to various friends of his, and further that all of the cash *114 proceeds of these checks were distributed to or for the benefit of those friends. Petitioner further alleges that he never received any of the proceeds of those checks, nor did he receive any compensation for his services in providing that accommodation. If petitioner prevails with respect to this additional income issue, all of the remaining issues become moot. The parties agree that petitioner received the various checks, endorsed them, and cashed them. The basic question is what happened to the cash. Petitioner testified that in every case he was doing a favor for the other party, and that he never at any time received any of the proceeds of the checks or received any compensation for his activity. The Court believes that petitioner was telling the truth. The record as a whole supports what he said. His bank balances were declining, his children's bank balances were minimal in nature, there is evidence that he was cashing in life insurance policies, several of the witnesses agree that he was depressed because of his financial setbacks that led to his excessive drinking, and probably played a part in his marital difficulties. Treisman's testimony confirmed petitioner's *115 story. The checks petitioner received from Treisman were for the purpose of paying Treisman's gambling debts. Treisman testified that the income reported on petitioner's tax returns from TBI was accurate in amount for his part-time work for TBI, and that those were the only amounts paid to petitioner by Treisman. Theresa Ring and Anthony Costa both testified for petitioner. Ring had been a longtime employee as a waitress and bartender at the Hideaway. She had known petitioner's father and she had known petitioner since he started working there in 1961. Costa began working at the Hideaway about 1970, and since then has worked there off and on part time and full time. Ring and Costa testified that on many occasions they had gone to the bank for petitioner to cash checks, and on their return with the cash, they saw the cash delivered to the person who gave the check to petitioner, and that petitioner never got any of the money. Respondent would discredit the testimony of Ring and Costa, since they both knew and liked petitioner and would try to help him. The Court finds that both Ring and Costa were credible witnesses who were telling the truth, and who in all respects supported *116 petitioner's story. Felix and Anthony were called by respondent to present a picture of petitioner receiving numerous checks, the proceeds of which he kept. Neither of them is a very credible witness. Felix at one time had to be warned by the Court of his oath and obligation to tell the truth. With respect to the checks received by petitioner, Felix and Anthony admitted as to many that they received the proceeds from petitioner. As to others, they denied receiving the proceeds, but never said who did. They did not testify that petitioner received the proceeds, and left open the possibility that their bookmakers received the proceeds in satisfaction of their gambling debts. The fact that they did not receive those proceeds directly, but that they were used to satisfy their debts, would no doubt justify in their own minds the statements that they did not receive the proceeds. Thus, even assuming that the testimony of Felix and Anthony should be given any weight at all, it would not refute or discredit the testimony of petitioner. Respondent's whole case rests on petitioner's being a bookmaker. Petitioner has denied this and his testimony has been supported by Treisman, Ring *117 and Costa. An acknowledged bookmaker by the name of Albert Longo with whom petitioner, Felix and Anthony placed bets during these years testified that petitioner was not a bookmaker. Even Felix and Anthony, respondent's key witnesses and petitioner's former friends, refused to go as far as saying petitioner was a bookmaker. After observing and evaluating the witnesses and reviewing the record as a whole, the Court finds that petitioner did not receive the proceeds from any of the checks received and negotiated by him as determined by respondent, nor did he receive any other compensation for the services and accommodations which he rendered to various parties during the years at issue. The Court also finds that petitioner was not a bookmaker during the years at issue. Because of the conclusion that petitioner did not have additional unreported income, the remaining issues regarding fraud, the statute of limitations, income averaging, and an "innocent spouse" are moot, and no recalculation of the medical expense deduction is necessary. In order to reflect concessions made by respondent, Decisions will be entered under Rule 155.
Footnotes
1. All references to sections are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue.↩